# IN THE COURT OF APPEALS OF IOWA

No. 22-0934
Filed April 26, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ELIJAH SAMUEL PAULSON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dickinson County, Don E. Courtney, Judge.

Elijah Paulson appeals his convictions for second-degree sexual abuse, lascivious acts with a child, and child endangerment. **AFFIRMED.**

Jack Bjornstad of Jack Bjornstad Law Office, Spirit Lake, for appellant.

Brenna Bird, Attorney General, Sheryl Soich, Assistant Attorney General, and Kelly Lynch, Student Legal Intern, for appellee.

Heard by Vaitheswaran, P.J., Badding, J., and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**DOYLE, Senior Judge.**

Elijah Paulson appeals his convictions for second-degree sexual abuse, lascivious acts with a child, and child endangerment. He challenges the sufficiency of the evidence supporting his convictions. Because substantial evidence supports his convictions when viewed in the light most favorable to upholding the verdicts, we affirm.

**I. Background Facts and Proceedings.**

The State charged Paulson with eight crimes following allegations that he sexually abused two young family members. Those allegations surfaced in August 2020, when the mother of three-year-old A. found A. with Paulson inside his locked bedroom. Paulson did not respond to her knocking at first, so A.'s mother began to pound on the door. When the door eventually opened, A. was standing by Paulson's bed. Her pants were crooked, and she looked afraid. Paulson, who was holding a package of wet wipes, put his arms up "in a surrender mode."

A.'s mother took A. upstairs and asked if she was okay. A. said, "Eli wanted to play a game. He rubbed his pee pee"[1] and pointed to her vagina. When other family members were asked if Paulson had ever touched them, nine-year-old T. revealed that Paulson had sexual contact with her. Law enforcement was notified about the children's allegations.

During the law enforcement investigation, T. recounted multiple instances of sexual abuse by Paulson that occurred over time. She recalled Paulson

---

[1] Although Paulson argues there is no evidence that A. knows what a "pee pee" is, we agree with the State that it is a term often used by young children to describe genitals.

showing her pornographic videos, which Paulson told her to keep secret. She also recalled Paulson rewarding her with candy or ice cream for performing sex acts on him. T. also drew pictures of many sex toys that Paulson had and described how they were used. After securing a search warrant, law enforcement recovered items in Paulson's bedroom that matched the sex toys T. depicted and described. They also discovered that Paulson removed a My Little Pony collection[2] from his room and erased one of his computer's hard drives after the incident with A.

Paulson denied wrongdoing. He admitted touching A.'s genitals but claimed he only did so because A. complained, "There is a knife in my butt." Paulson said he removed her pants to look for irritation. When he saw what he believed to be evidence of a yeast infection, he used an aloe vera wet wipe to clean her.

When asked why he locked A. inside his bedroom, Paulson claimed he did so by accident. He explained that he shares his home with his parents and routinely locks the door for privacy when he is in his room. Paulson said A. went

---

[2] Paulson, who was thirty-seven years old at trial, is a fan of *My Little Pony: Friendship Is Magic*, an animated television series based on the Hasbro toy franchise. Although created to appeal to young girls, Paulson explained, "There is a surprising fan base of men my age ranging anywhere from [twenty-five] to [thirty-five]." He described the series as his "audiovisual antidepressant" and explained its appeal to those outside the target demographic:

> The pastel colors they use are incredibly calming and relaxing. The musical numbers—they use a lot of this, I found out, was literally designed to make you happier and calm. The show is literally designed to draw people in. It happened to have a big influence on middle-aged adults who were depressed and needed something to cling onto to make themselves, well, a little bit less depressed.

As a result of his interest in the series, Paulson owns My Little Pony collectible toys, which he allowed the children to play with. Paulson testified that after the first search warrant, he "became very depressed" by anything that directly reminded him of the accusations against him. The My Little Ponies collectibles reminded him of the accusations because he played with the collectibles with the children, so Paulson put them in storage.

into his room without his knowledge when he went to attend to his parents' dogs. On returning, he locked his door out of habit. Paulson then discovered A. seated at his desk chair, watching a pornographic video that Paulson did not realize was open on his computer. To distract her from what she had seen, Paulson said he moved A. to his bed and gave her My Little Pony toys to play with.

Paulson denied he had child pornography on his computer or that he erased his hard drive to destroy evidence. He claimed that before this incident, he planned to erase the backup hard drive from his computer to replace the failing hard drive in his mother's computer. On that day, Paulson was readying the drive when A. complained of pain.

Finally, Paulson tried to explain his failure to answer immediately when A.'s mother knocked on his door. He claimed that he used headphones to listen to an audiobook and take a call from his brother. The headphones prevented him from hearing when A.'s mother knocked. It was not until she began pounding on the door that Paulson heard and opened the door. He explained that he looked surprised because the noise startled him. Because A.'s mother looked angry, he claimed he put his hands up in a placating gesture and tried to tell her that there was no reason to be mad.

A bench trial was held after Paulson waived his right to a jury trial. T. testified at trial, but A. could not.[3] The trial court found Paulson guilty on two counts

---

[3] Two attempts to depose A., then four years old, failed because the court reporter found her too young to place under oath. A., who was scared, stated that she could never come to the courtroom and tell the truth.

of second-degree sexual abuse, lascivious acts with a child based on touching,[4] and child endangerment—one count related to A. and one related to T. Paulson appeals the three convictions related to A.

### II. Sufficiency of the Evidence.

Paulson challenges the sufficiency of the evidence supporting his convictions on the three charges related to A. We review the sufficiency of the evidence for correction of errors at law. *See State v. Lacey*, 968 N.W.2d 792, 800 (Iowa 2021). We apply the same standard in reviewing a claim of insufficient evidence in a bench trial as we do in a jury trial. *See State v. Myers*, 924 N.W.2d 823, 826 (Iowa 2019). We are "highly deferential" to the verdict and affirm if it is supported by substantial evidence. *Lacey*, 968 N.W.2d at 800. Evidence is substantial if it may convince a rational person of the defendant's guilt beyond a reasonable doubt. *Id.* In making this determination, we view the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the State. *Id.* The question is whether the evidence supports the finding the court made, not whether it would support a different finding. *See id.*

Paulson contends the evidence of his guilt related to A. "is next-to-non-existent and merely raises suspicion, speculation, and conjecture." A. did not testify at trial, and the trial court ruled her videotaped interviews with the Child Advocacy Center were inadmissible. The evidence presented about the incident

---

[4] It found Paulson not guilty on two counts of lascivious acts with a child based on solicitation.

with A. was largely limited to the testimony of A.'s mother and Paulson.[5]  From that evidence, the trial court was presented with two versions of events: the State's and Paulson's.

The State's version of events, which is supported by the testimony of A.'s mother, is straightforward: Paulson locked A. in his bedroom, exposed her to pornography, removed her pants, and touched her genitals for his own arousal before A.'s mother interrupted.

Paulson's version of events is less so.  He presents a remarkable occurrence of events that casts suspicion over what was, ultimately, an innocent interaction.  In his version, Paulson returns home from work and enters the passcode to unlock his computer, which—unbeknownst to him—has a pornographic video on the screen.  Before he notices the pornography, Paulson must leave the room to deal with his parents' dogs.  While he is out, three-year-old A. slips inside undetected and climbs into Paulson's desk chair, where she begins

---

[5] A.'s grandfather, who was in the room when A.'s mother brought her upstairs from Paulson's room, also testified.  He did not recall A. saying anything specific about Paulson:

> Q. What happened when [A.] came up while you were standing there and your wife is there with her mom?  A. They were talking, and all of a sudden she said something about a penis, and then everything went crazy.
> Q. There is some statement in the record about Eli wanted to play a game.  He put his penis in this area, something like that.  Was anything like that said?  A. No.
> Q. How do you know?  A. Well, if I recall right, I think she said she saw.  That was it.  She saw a penis.

Although his testimony was not definite, it conflicts with that of A.'s mother, who testified A. said Paulson "rubbed his pee pee."  But whether A. stated she saw a penis based on the pornography rather than seeing Paulson's penis, Paulson admits that he touched A.'s genitals with his hands.  The State did not need to show he touched her genitals with his penis so long as the contact was sexual.

watching the video on the screen. Paulson returns to his room and locks his door, as is his habit, before noticing A. He finds her sitting in front of his computer watching pornography and removes her from the computer. Rather than removing her from the room, Paulson sits A. on his bed and gives her ponies to play with in hopes she will forget what she saw on his computer. After he returns to the computer "to clean out [his] web browser so that wouldn't happen again," A. complains about her genitals hurting. In response, Paulson removes her pants to find the cause of her pain.[6] He sees what he thinks is evidence of a yeast infection and cleans the area with an aloe vera wet wipe.[7] He then returns to his computer to erase the backup hard drive, which he planned to use as a replacement for his mother's hard drive. As he worked on the computer, Paulson listened to an

---

[6] Paulson explained why he—a single, childless man—felt comfortable personally investigating a three-year-old girl's complaint of genital pain when her mother and grandmother were in the house:

> Well, I used to live with another brother. I was live-in baby-sitter for over a year with my brother . . . . So I took care of an infant, a four-year-old and a six-year-old. I think that's the ages. But I was used to it.
>
>      . . . .
>
>      And I was used to taking care of all kinds of child-related issues. So she says it hurts. You check real quick and see if there is an irritation. Maybe I go tell Mom or I go tell her grandmother that she has a rash and she needs some medication for it or something, you know, instead of just throwing her out and say I don't care, go talk to grandma.

[7] Paulson testified that he found "some sort of . . . white little pustules. I don't know what they were." Although he has never seen a yeast infection, he testified that he believed A. had a yeast infection based on things he had heard his sisters say in his presence. He then explained, "First thing for any of these things that I know of is you keep the area clean. So I had these wipes, aloe vera wipes that I use on myself. . . . I used the wipes to clean up the little white things, little kernels, little— I don't know." A.'s mother testified that A. has never had a yeast infection, and no evidence of a yeast infection was discovered after the incident.

audiobook and took a phone call on his headphones.  The sound from the headphones causes the delay in him answering his door when A.'s mother arrives.

The State provides the more plausible version.  The events described by Paulson appear reverse-engineered to explain the known facts.  Arguably, one or more of those events could occur in isolation.  But the credibility of his explanation diminishes with each event added to the chain.  Taken as a whole, it is a bridge too far.  Viewing the evidence in the light most favorable to the verdict, substantial evidence supports the finding of guilt.  We affirm.

**AFFIRMED.**